Hibernian Banking Association, Trustee in Bankruptcy of Cooke-Rutledge Coal Co., Plaintiff in Error, v. Eckhart & Swan Milling Co., Defendant in Error.

Gen. No. 13,509.

CONTRACTS—*when continued existence of, inferred.* A contract continues in force notwithstanding default, where the party against whom the default is made affirmatively so treats it.

Assumpsit. Error to the Circuit Court of Cook county; the Hon. JULIAN W. MACK, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed April 6, 1908.

**Statement by the Court.** Plaintiff in error was plaintiff, and defendant in error defendant, in the trial court. As all the transactions in question were between the Cooke-Rutledge Coal Co. and the Eckhart & Swan Milling Co., the former will be referred to as plaintiff and the latter as defendant.

The declaration consists of the common counts in *assumpsit.* The defendant pleaded the general issue and under it filed a notice of set-off, which notice was twice amended pending the trial. The cause was heard by the court without a jury. At the close of the evidence the plaintiff moved the court to strike out the defendant's evidence and for a finding and judgment for the plaintiff, which motion the court overruled, and found the issues for the defendant and assessed the defendant's damages at the sum of $1,885.34, and after overruling plaintiff's motions for a new trial and in arrest of judgment rendered judgment on the finding.

March 28, 1902, the following contract was executed by plaintiff and defendant:

"Memorandum made this day, March 28, 1902, by

480    APPELLATE COURTS OF ILLINOIS.

VOL. 140.]    Hibernian Bank. Assn. v. Eckhart & Swan Mill. Co.

and between the Cooke-Rutledge Coal Company of Chicago, Illinois, of the first part, and Eckhart & Swan Milling Company, 377 Carroll Ave., of the second part; WITNESSETH:

That we, the undersigned agree to furnish and deliver to the Eckhart & Swan Milling Company, on board of cars at their station, Chicago, Ill., located on the Panhandle Railroad, all the Screenings that they may need from the date hereof until April first, 1903, approximating the quantity of ten (10) cars per week, or as much as they may require, during the continuance of this contract.

The second party to have the option of taking all of their requirements in whatever quantities or portion per day that they may need at the following price per ton of 2,000 lbs., viz: $1.28 per ton, F. O. B. cars their plant. Coal to be paid for on basis of weights of party of the second part.

The coal furnished is to be of such grade as I have been furnishing you in the past, viz: the Vandalia District. Quality to be satisfactory to party of the second part.

The party of the second part agrees to buy all their requirement of coal during the period hereinbefore specified.

We will use every effort for prompt and satisfactory delivery of all cars, but will not hold ourselves responsible for delay of coal in transit, blockades, strikes, or any contingencies beyond our control.

In case of strike, blockade, or other contingencies, the party of the first part agrees to furnish coal of equal quality.

In witness, the parties herewith have set their hands and affixed their seals this day, 29th of March, 1902.

CooKE-RUTLEDGE CoAL Company,
By Edward F. Cooke, Vice-Pres. and Gen. Mgr.
ECKHART & SWAN Milling Company,
B. A. Eckhart, Prest.''

Plaintiff, as its name indicates, is a dealer in coal, and has an office in the city of Chicago. The defendant has a flour mill in said city, in which it consumes about thirty tons of coal every twenty-four hours, except on

Sundays, when it only uses about three or four tons, in order to keep steam up and the fire from going out. Defendant had vault room for only about 100 tons of coal. It appears from the evidence that during the latter part of November and December, 1902, and January, 1903, the market price of soft coal increased very materially. Mr. Eckhart, defendant's president and treasurer, testified that in the latter part of November and the early part of December, 1902, defendant was in fear of being obliged to shut down the mill for want of coal; that there was not enough in sight on defendant's tracks or the tracks of the Panhandle Railroad, by which road coal was consigned to defendant, to keep defendant's plant in operation, and that when witness arrived at the mill about 6:45 o'clock in the morning of December 9, 1902, the mill was shut down for want of coal; that there were only about two or three tons in the vaults, and that when he left the mill, a little before ten o'clock, it was still shut down.

Hewitt, assistant manager for defendant, testified that during the latter part of November defendant's bins were never full, and that December 2nd, 3rd, 4th and 5th, defendant had only from five to eight tons on hand, and that December 9th he called up Mr. Cooke, plaintiff's assistant manager, and told him that defendant's plant was shut down for want of coal, and that the plaintiff must supply coal.

Raithel, defendant's miller and superintendent, and Kucera, assistant manager of defendant, both testified that defendant's mill was shut down December 9th for want of coal.

December 4th defendant inclosed in a letter to plaintiff a statement of coal received from plaintiff from November 1st to November 15th, with check for same. The letter is as follows:

"Gentlemen: We herewith hand you check covering the amount of statement enclosed. As per our conversation with you over phone, we are running very low on coal and must have some immediately. Kindly see to it that we are kept supplied. Do not fail to attend to this and oblige," etc.

482    APPELLATE COURTS OF ILLINOIS.

VOL. 140.]    Hibernian Bank. Assn. v. Eckhart & Swan Mill. Co.

On the same day Mr. Cooke had a telephone conversation with Mr. Hewitt, in reference to which he testified that he said to Hewitt: "I am not able to give you screenings. We can't get the stuff. I can give you three cars of mine run at $3.00 a ton. That is the only stuff I can get over the Panhandle, and Hewitt said he did not like mine run, that it was a little inconvenient, but to turn it over."

After December 4th the following correspondence occurred:

Plaintiff to defendant:

"DECEMBER 6, 1902.

"GENTLEMEN: We received your check and thank you very kindly for same.

We note your paragraph regarding your telephone communication regarding how low you are running on coal, which we, of course, regret very deeply, but you have certainly 'phoned several of the coal men and found their situation was the same as ours and that we are not liable to blame at all, it lays wholly with the railroads. We would have been able to take care of you nicely if they had brought our coal to Chicago.

We understand from Mr. Loomis, agent, they have an embargo on all shippers which misfortunately stops all fine coal coming to Chicago, as well as coarse which they are aiming at.

We have shipped you three cars of mine run, which we paid $2.60 for and will render you bill for same."

Defendant to plaintiff:

"DEC. 9. 1902.

We have taken the matter up with the Panhandle Railway, of an embargo having been placed on coal coming here.

They assure us there is not at present and has not been any embargo on coal coming into Chicago for our account. You are, therefore, in error when you say there has been an embargo placed against coal coming to Chicago for our account.

You must see that you keep us supplied with coal as per contract."

Defendant to plaintiff:

"DEC. 22, 1902.

We have a contract entered into between your company and the Eckhart & Swan Milling Company, dated March 28, 1902, under which you are to keep us supplied with screenings until April 1, 1903. For some weeks now you have failed to keep us supplied as per your agreement, and have compelled us to buy coal from other parties in order to keep our plant in operation, although we have repeatedly called you up on the 'phone urging and requesting you to furnish us with screenings as per your contract. We are therefore again compelled to notify you that you must keep us supplied under the terms of the contract."

Plaintiff to defendant:

"DEC. 23, 1902.

We received your kind favor of the 22nd and have noted same fully and carefully. The only reply we have to make, gentlemen, is that the condition existing and has been for some time certainly was not through the fault of the coal men. The contract entered into by your company and our office stated clearly that we are not to be held responsible when the railroads cannot bring the coal forward. We have done all in our power that any firm or shipper could do, and it is simply up to you to fortify yourself at every possible opportunity, as our other contracts which we hold are doing.

There is not a firm in the city of Chicago today in the coal business that can get up and say they are fulfilling the contracts they have on their books. They have not got the coal to do it with, or getting it in sufficient quantities to enable them to do so. We have other contracts, for illustration, the People's Gas Light & Coke Company, that are only too glad for us to go into the market and buy the coal, charge it up to them at cost purchased price quoted us that we keep them in coal, that it is all they ask for. We are doing this with you, and cannot stand any differential. The Panhandle is in the worst shape, we believe, of any road in Chicago. We are under an expense of $100.00 a month, which we pay a man who continually searches the Panhandle for coal and additional to this we have a man trying to buy up, but we cannot do it.

484    Appellate Courts of Illinois.

Vol. 140.]    Hibernian Bank. Assn. v. Eckhart & Swan Mill. Co.

We trust you will appreciate the position we are in, and use every effort to assist us until this scarcity is over with, which will undoubtedly be after the Holidays.

We appreciate your patronage and have strived very hard to take care of you right, which we believe we have done up to the time this flurry took place. We remain.''

Defendant to plaintiff:

"Dec. 24, 1902.

We are in receipt of your letter of the 23rd. We cannot understand the position you take in this matter. You have not furnished us with numbers of any cars of screenings shipped recently at all, and there is no blockade or strike on at present. The Panhandle is ready and willing to deliver all coal loaded by you to us. The trouble appears to be with you, for you are not billing us any coal, and not been doing so recently. This is certainly a violation of your contract, and which contract we expect you to carry out.

Your failure to carry out your contract has compelled us in two or three instances to close down our plant, on account of not being supplied by you.

You should see that we are supplied with screenings immediately.''

In a letter of date December 30, 1902, from defendant to plaintiff, defendant calls plaintiff's attention to the contract requiring plaintiff to furnish it with screenings till April 1, 1903, and saying that plaintiff had failed to furnish screenings for four or five weeks; also stating that there was no strike or blockade of any kind, and that the Panhandle had informed defendant that it had not refused to receive screenings from plaintiff consigned to defendant, and again requesting plaintiff to forward immediately the usual quantity of coal per week.

January 6, 1903, plaintiff wrote to defendant a letter containing the following:

''We have worked and made it our policy to always have the good will of every patron we have on our books. There was only one thing for you to do when

the situation which is now confronting us started in, was to say to us, 'Get us some screenings from any road, make arrangements with the Panhandle for switching, go out and buy fifty cars if necessary to get this amount, and keep us going.'

You must remember our contract is on Vandalia Screenings, but we have evidence that you have bought coal on another line and paid $2.50. If it was your intention to do what is right, you would have given us the privilege and we would have saved you a great deal of money, possible by buying for ourselves, as we would have been more interested in making a minimum cost for you than those who you went to, as they know you have a contract and they took advantage of you. If you want us to do what is right by you, you must treat us the same way, we want you to understand that if you are buying coal on the outside without consulting us and giving us the privilege of doing what is just with you, we will consider our contract cancelled. We remain."

January 7, 1903, defendant again wrote to plaintiff, complaining that plaintiff had failed to comply with its contract, and that plaintiff had not, for the last three or four weeks, furnished defendant with any coal, and stating that there was no strike at the Vandalia mine, nor any railroad blockade, and notifying plaintiff that the defendant would hold it responsible for any loss which it would sustain by reason of plaintiff's failure to keep its contract. There is no evidence in the record of any strike at the Vandalia mine, or any railroad blockade. After December 4th or 5th plaintiff did not furnish defendant with any screenings, and did not, after December 10th, bill any coal of any kind to defendant.

Hewitt testified that December 9th, when he called up Mr. Cooke on the telephone, and told him the mill was shut down, etc., Cooke said, "I have not got the coal and can't get it. I have simply got to lay down," and Mr. Hewitt said, "Mr. Cooke, we want you to fulfill your contract; you must supply us with coal," and he said, "I cannot do it."

486    APPELLATE COURTS OF ILLINOIS.

VOL. 140.]    Hibernian Bank. Assn. v. Eckhart & Swan Mill. Co.

Mr. Cooke testified that what he said was that he could not do anything about the coal until he could make arrangement with the Illinois Central, and that defendant had broken its contract by buying from others, when it had an ample supply.

Mr. Cooke was corroborated in respect to what he said by Mr. Schaeffer, plaintiff's secretary, and by Mr. Rutledge, plaintiff's president, but the latter says he did not hear all the conversation, and no one of the three directly contradicts Hewitt's testimony.

It seems from Mr. Cooke's testimony that plaintiff's contemplated arrangement with the Illinois Central Co. fell through, because of that company's switching charges. The coal shipped by plaintiff to defendant prior to December 5th, which was screenings, was billed at the contract price, $1.28 per ton, and that shipped after December 5th, which was mine run, was billed, some at $2.60 and some at $3.00 per ton, and defendant paid the freight charges on it, amounting to $235.85, for which it is entitled to credit, as per a stipulation between the parties in evidence. After the receipt by defendant of plaintiff's letter of December 6th, defendant purchased two cars of coal from O'Gara, King & Co., which were delivered to it, one car January 2, 1903, and one January 8, 1903; and also, December 8 and 9, 1902, ordered two cars of coal from Geo. G. Pope, which were received by it December 9th or 10th. After December 10th, when plaintiff ceased to supply defendant with coal, the latter purchased its coal from other parties. The plaintiff, as heretofore stated, after it ceased to furnish defendant with screenings, furnished it with certain cars of mine run coal, which it billed to defendant at $2.60 and $3 per ton, and in the plaintiff's original and first amended bill of particulars the coal is so charged; but on its second amended bill of particulars the mine run coal is charged at the contract price for screenings, namely, $1.28 per ton. The plaintiff's claim is for coal consigned to defendant

from October 15 to December 10, 1902, both dates inclusive, at the rate of $1.28 per ton, amounting to $578.80. Defendant purchased from parties other than defendant 3,739,300 pounds of coal, to supply its needs, for which it had to pay largely in excess of the contract price, the price ranging from $1.45 to $3 per ton, and its claim of set-off is the excess over the contract price which it had to pay for this coal plus $235.85 freight charges, which it paid on mine run coal shipped to it by plaintiff, and which last sum it is, by stipulation between the parties, entitled to be credited with. There is no evidence that defendant paid more than the market price for coal, or more than the plaintiff would have had to pay for the coal had it purchased it. Neither is there any dispute as to the correctness of the amount of the plaintiff's bill for coal furnished to the defendant, or the correctness of the amount of the defendant's claim of excess over the contract price paid by it for coal. Neither is it claimed by the plaintiff that the judgment is excessive, on the hypothesis that the defendant is entitled to recover on its notice of set-off.

CHARLES E. POPE, for plaintiff in error.

WEST, ECKHART & TAYLOR, for defendant in error.

MR. JUSTICE ADAMS delivered the opinion of the court.

Counsel for plaintiff objects that the notice of set-off filed with the defendant's plea as amended is insufficient, but merely refers us, without serious argument, to thirty objections made to the notice in the trial court. These objections were fully argued in the trial court and were overruled, and we concur in the ruling of that court. We think the notice amply sufficient to admit of evidence of defendant's claim of set-off. We are of opinion, after a very careful consideration of the evidence, that the learned judge of the trial court was warranted by the evidence in find-

488    Appellate Courts of Illinois.

Vol. 140.]   Hibernian Bank. Assn. v. Eckhart & Swan Mill. Co.

ing that the plaintiff failed to perform its contract, and that the defendant, under the facts in evidence, had the right to purchase coal in the open market to meet the requirements of its plant. At least it cannot, as we think, be truly said that the finding is manifestly against the weight of the evidence. The evidence shows, without contradiction, that in the latter part of November and in December, 1902, and January, 1903, the market price of coal had materially advanced, so as to be much above the price fixed by the contract between the parties; and it was clearly the defendant's interest to procure coal from the plaintiff under the contract between them, if possible. There was absolutely nothing to be gained by defendant by purchasing from other parties in the open market, unless compelled to do so by plaintiff's failure to supply it with coal. On the contrary, by so doing it was necessary for it to pay a much higher price for the coal than if supplied with it by the plaintiff under the contract.

Plaintiff's counsel contends that the defendant was first in default in the performance of its contract, and therefore not entitled to recover for plaintiff's default, if any, either in a direct suit or by way of set-off. The basis of this claim is that defendant failed to pay for coal included in plaintiff's amended bill of particulars, of the value of $578.80, at the contract price of $1.28 per ton. The plaintiff's bill of particulars, the correctness of which is not questioned, shows coal shipped by plaintiff to defendant October 15, November 26, December 1, December 5 and December 10, 1902. The evidence for defendant tends to prove that the coal shipped October 15th was unloaded and weighed by defendant October 22nd, and of that shipped November 26th, some was unloaded and weighed December 1, some December 4, 1902, and some January 12, 1903, and that coal shipped December 1, 1902, was unloaded and weighed December 2nd, 3rd, 5th, 12th and 18th. Coal shipped December 5th was unloaded

and weighed December 8th, and coal shipped December 10th was unloaded and weighed December 13th, 15th, 16th and 19th. All of the aforementioned coal, except that shipped October 15th, was received, unloaded and weighed by the defendant about the time defendant became fearful that the plaintiff would fail to perform its contract. Mr. Eckhart testified that in the latter part of November and early part of December, 1902, defendant's supply of coal was inadequate; that there was not coal enough in sight, which defendant could get, to keep its plant in operation, and it was in constant fear of being obliged to shut down. Also defendant's letter to plaintiff of December 4th, stating that defendant was "running very low on coal," and requesting immediate shipment, and plaintiff's answer of December 6th to that letter, saying, among other things, "Regret your running low on coal. You must have 'phoned coal men and found their situation same as ours. Blame lies with railroads," etc., are evidence that defendant was not supplied with coal as required by the contract. Under these circumstances, we are inclined to the view, which we think must have been that of the trial court, that the defendant was warranted not only in purchasing coal in the open market, but in withholding payment for that already received by it while it remained doubtful whether the plaintiff would furnish it with coal as per contract. In plaintiff's letter of December 6th it substantially admits its inability to fulfill its contract, and in its letter of December 23rd it seems to authorize defendant to get coal in any possible way. Mr. Schaeffer, plaintiff's secretary and treasurer, testified that defendant was in the habit of sending statements of weight of coal received and remitting by check twice a month, to which no objection appears to have been made. Mr. Cooke, plaintiff's assistant manager, testified that he never doubted the defendant's financial responsibility, and Mr. Eckhart testified that during the months of December, 1902, and January, February, March and April, 1903, the

490   APPELLATE COURTS OF ILLINOIS.

VOL. 140.]   Hibernian Bank. Assn. v. Eckhart & Swan Mill. Co.

defendant was always ready and able to pay any bill it owed. The suit was brought April 23, 1903, without any previous demand for payment. Before suit brought plaintiff sent two bills to defendant, both for mine run coal—one for $2.60 and one for $3 per ton, which defendant was under no obligation to pay, as is practically admitted by plaintiff, in amending its bill of particulars, charging $1.28 for mine run coal. The question to be decided is one of law, viz: Whether defendant's omission to pay for the coal, shown in plaintiff's second amended bill of particulars, is a default which precludes a recovery by defendant on its notice of set-off and the evidence in support thereof. Neither party attempted to rescind the contract, and the defendant never intended to abandon it, as is evidenced by its letters to the plaintiff insisting on plaintiff's fulfillment of the contract. Neither did the defendant intend to violate the contract by withholding payment for coal delivered to it in pursuance of the contract. This is evidenced by the fact that, December 4, 1902, it sent to plaintiff a check for coal received by it from November 1st till November 15th. This the plaintiff received, without objection that the October coal, which defendant unloaded and weighed October 22nd, had not been paid for. The defendant had no apprehension of non-payment for coal delivered in pursuance of the contract, and evidently acquiesced in the defendant's manner of payment. The sending to defendant bills for mine run coal at $2.60 and $3 per ton, if considered as a demand for payment, was a demand which the plaintiff had no lawful right to make, in view of the contract. It is evident from the plaintiff's letter of January 6, 1903, that it then regarded the contract in force, notwithstanding payment for coal received by the defendant prior to that date had not been made. See Bollman v. Burt, 61 Md. 415, 422.

In West v. Bechtel, 125 Mich. 144, the plaintiffs were coal and wood dealers in Grand Rapids, and the defendant was a dealer in wood at Menton, Michigan.

The parties made a contract January 14, 1899, by which the defendant agreed to sell to the plaintiffs 400 cords of wood at one dollar per cord, free on board car at Manton, the defendant agreeing to ship right away, and plaintiffs agreeing to remit as fast as the wood would "come in." Three carloads were shipped by the defendant, and two were paid for by the plaintiffs, when, February 24, 1899, the plaintiffs wrote to the defendant, saying, "Your conversation over telephone day before yesterday confirms our idea that you did not intend to fill contract," adding that, though the price had materially advanced, they would expect the wood, and would be seriously damaged if it should not be shipped. February 28, 1899, the defendant wrote to the plaintiffs, saying that plaintiffs had agreed to pay for wood as fast as it came in; that defendant had shipped a car to them February 4th, which they had admitted, on February 21st, they had received two weeks before that date, and which they had not paid for, and threatened to sue if not paid. There was evidence tending to prove that in the conversation by telephone defendant asked the plaintiffs, "When are you going to pay for that?" and the plaintiffs answered, "We will pay for that when we get some more," and defendant replied that plaintiffs would have to pay for that before they would get any. There was evidence that the price of wood had advanced since the making of the contract to $1.40 per cord, and that the defendant was offering to sell and sold wood at that price. Plaintiff sued the defendant for breach of the contract in refusing to deliver the wood contracted for. The trial court instructed the jury as follows:

"A contract of this character might be broken up by either party. A refusal to pay—nonpayment according to the terms of the agreement—might, under certain circumstances, constitute such a breach of the contract as would release the other party, and a refusal to deliver might be such a breach of the contract on the part of the defendant as would release the

492 APPELLATE COURTS OF ILLINOIS.

VOL. 140.] Hibernian Bank. Assn. v. Eckhart & Swan Mill. Co.

other party, or give him a cause of action. But the particular circumstances connected with the case ought to be taken into consideration. The mere refusal to pay for a portion of the property delivered until more was received would not alone constitute such a breach of the contract as would warrant the other party, the defendant, in repudiating the entire contract, but, to warrant the defendant in refusing further to perform his part of the contract by delivering the wood which he had contracted to deliver, it ought to be made to appear that there was not merely a refusal to pay at once for the portion already delivered, but the circumstances connected with the whole matter, the conduct of both parties, ought to be taken into consideration, and it should be made to appear, to warrant the defendant in refusing further to deliver, that the conduct of the plaintiffs was such as indicated that they did not intend to perform their part of the contract.''

Error was assigned on the instruction, but the reviewing court, in a very thorough and exhaustive opinion, citing numerous English and American cases, sustained the instruction, and affirmed a judgment for the plaintiff. The court cites Mersey Steel & Iron Co. v. Naylor, 9 Q. B. Div. 648, 9 App. Cases 434, in which it is said, ''The true question is whether the acts and conduct of the party evince an intention no longer to be bound by the contract.'' The court also cite Blackburn v. Reilly, 47 N. J. L., 290, in which case, p. 308, the court say: ''In our opinion, the rule established in England by the judgment of the House of Lords in Mersey Steel & Iron Company v. Naylor, 9 App. Cas. 434, affirming the judgment of the Court of Appeals in S. C., 9 Q. B. D. 648, is one which in ordinary contracts of this nature, will work out results most conformable to reason and justice. The rule is, that defaults, by one party in making particular payments or deliveries will not release the other party from his duty to make the other deliveries or payments stipulated in the contract, unless the conduct of the party in default be such as to evince an intention to abandon

the contract or a design no longer to be bound by its terms." See also Winchester v. Newton, 2 Allen 492. In that case the court distinguished between a mere omission to pay and an unqualified refusal to pay. In the present case time of payment is not of the essence of the contract; the plaintiff acquiesced in the manner of making payment adopted by the defendant, and some of the coal sued for by defendant was delivered to the defendant after payments for former deliveries were due. There was no refusal to pay, and no demand for payment except the suit, and the defendant has not, by its acts or conduct, evinced any intention no longer to be bound by the contract, or not to pay for coal delivered to it, and now, when for the first time demand has been made, the defendant offers to pay the contract price for coal delivered to it by plaintiff, by crediting plaintiff with it on the amount which it was obliged to pay others for coal, by reason of the plaintiff's manifest default, seeking only to recover the excess of what it was so obliged to pay over the contract price. We think this reasonable and just.

We find no error in the court's rulings on propositions of law requiring reversal of the judgment. The judgment will be affirmed.

*Affirmed.*